[Cite as *In re S.J.*, 2026-Ohio-541.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: S.J.

C.A. No.   31683

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.   DN 24 12 0836

DECISION AND JOURNAL ENTRY

Dated: February 18, 2026

FLAGG LANZINGER, Presiding Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her child in the permanent custody of Summit County Children Services Board ("CSB" or "the agency").  This Court affirms.

I.

{¶2}    Mother is the biological mother of S.J., born March 31, 2019.  The child's paternity has not been established.  Mother is also the biological mother of three older children, all of whom are in the legal custody of relatives.

{¶3}    In 2018, Mother was convicted of misdemeanor child endangering in relation to at least one of her older children.  In 2022, she was convicted of two counts of felony child endangering after she left one son and S.J. in a car in a bar parking lot while Mother was inside drinking.  CSB removed the two children from Mother's care.  S.J. and her brother were adjudicated abused and dependent.  In April 2024, the juvenile court placed the child's brother in

the legal custody of a relative. In July 2024, the juvenile court returned S.J. to Mother's legal custody and closed the case.

{¶4} In December 2024, S.J. was in a car with Mother who was driving after drinking. Mother crashed the car. When police arrived at the scene, S.J. was trying to wake Mother who had passed out. There was an open bottle of tequila in the car. The police took S.J. into protective custody under Juv.R. 6 and arrested Mother. Mother was later convicted of one count each of felony child endangering and operating a vehicle under the influence, and misdemeanor open container.

{¶5} CSB filed a complaint alleging that S.J. was an abused, neglected, and dependent child. Mother waived her right to an adjudicatory hearing and stipulated to abuse and dependency. Mother later waived her right to a dispositional hearing. She agreed to S.J.'s placement in the temporary custody of CSB and adoption of the agency's case plan as an order. The case plan required Mother to obtain substance use and mental health assessments, follow all treatment recommendations, and identify possible biological fathers of the child. CSB placed S.J. in the same therapeutic foster home where she resided during the 2022 child welfare case.

{¶6} Mother did not attend the first review hearing because she was incarcerated at Oriana House. The guardian ad litem informed the trial court that she intended to file a motion to suspend Mother's visitation due to the child's severe emotional dysregulation after visits. Shortly thereafter, the guardian filed her motion, and the juvenile court granted it. The trial court maintained S.J. in the agency's temporary custody.

{¶7} Six months into the case, CSB moved for permanent custody. The agency alleged that S.J. could not or should not be returned to Mother's custody and that an award of permanent custody was in the child's best interest. Mother moved for legal custody.

{¶8} The juvenile court heard evidence on the parties' motions ten months into the case. At the conclusion of the hearing, the trial court terminated Mother's parental rights and awarded permanent custody of the child to CSB. Mother appealed, raising one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ABUSED ITS DISCRETION IN ITS GRANT OF PERMANENT CUSTODY TO THE COUNTY AS SUCH DECISION WAS NOT SUPPORTED BY THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶9} Mother argues that the juvenile court's judgment awarding permanent custody of S.J. to CSB is against the manifest weight of the evidence. This Court disagrees.

{¶10} In determining whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶11} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and

(2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶12} The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} As to the first prong, CSB alleged that S.J. could not or should not be returned to Mother pursuant to R.C. 2151.414(B)(1)(a). The juvenile court found that the agency had met its burden of proof based on two of the various subsection (E) grounds alleged. Those subsections provide as follows:

> In determining at a hearing [on a motion for permanent custody] whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a [permanent custody] hearing . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> . . .
>
> (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
>
> (6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section [R.C.] 2919.22 . . ., and the child or a sibling of the child was a victim of the offense . . [.]

Although the agency might allege alternative first-prong grounds in support of its motion for permanent custody, it need only prove one. *In re T.B.*, 2020-Ohio-4040, ¶ 11 (9th Dist.).

{¶14} CSB presented evidence by way of certified copies of judgment entries, proving that Mother had been convicted of two counts of child endangering under R.C. 2919.22(A), involving the child and her brother in 2022; and one count of child endangering under R.C. 2919.22(C), involving the child in 2024. Accordingly, CSB proved one of its first prong allegations by clear and convincing evidence. R.C. 2151.414(B)(1)(a) and (E)(6).

{¶15} As to best interest of the child, this Court concludes that CSB also met its requisite burden of proof. After spending close to half her life in agency care, the child needs a legally secure permanent placement. The caseworker testified that S.J. had twice been removed from Mother's care, experienced significant trauma, and now requires a home where she feels safe and protected. Mother's failure to address her case plan objectives demonstrates that she cannot provide that environment for the child.

{¶16} The caseworker testified that Mother had not engaged in substance abuse or mental health services, leaving her with no insight into the impact her actions had on the child. The caseworker testified that Mother has a pattern of drinking and driving. She emphasized that the agency opened the instant case a mere five months after the first case was closed for the same reasons but under worse circumstances. Specifically, the caseworker noted that Mother's behavior had escalated from leaving S.J. and a sibling unattended in a vehicle while Mother drank inside a bar to driving drunk with S.J. in the car, crashing, and remaining unconscious at the scene. Throughout the case, Mother denied that she had a problem with alcohol abuse, admitting only that she had made a bad decision to transport S.J. in a car after Mother had been drinking. In

addition to making these assertions to the caseworker, Mother repeated them in her testimony during the hearing.

{¶17} CSB further demonstrated that Mother cannot provide for the child's basic needs. Although Mother had an apartment through a subsidized housing agency, her gas and electric utilities had been turned off due to nonpayment of fees. Mother owed approximately $7,000 for past due bills and was facing possible eviction for failure to maintain utilities. Although Mother's utilities had been turned off during the first case with the agency, she failed to inform the caseworker of that until shortly before the final hearing to terminate protective supervision and maintain S.J. in Mother's legal custody. By the time Mother notified the caseworker that she no longer had working utilities in her subsidized housing, Mother had moved with the child into a home with Mr. J. Because that home appeared to be appropriate, CSB agreed to terminate its protective supervision. Although Mother continues to live in Mr. J.'s home, which is physically appropriate, the caseworker testified that the environment there is no longer safe based on S.J.'s disclosures regarding Mr. J.'s interactions with her during the five months the child was in Mother's legal custody.

{¶18} Mother has struggled in her attempts to pay her delinquent utility bills, even though she works and does not pay any rent to Mr. J. Mother works 20 hours per week but testified that she grosses $800 per week based on overtime. She admitted that she had not provided any paystubs to CSB to verify her income. Her driver's license is suspended for two years, requiring her to spend between $96 and $150 per week for Uber rides to and from work. The caseworker expressed concern that Mother would lose her subsidized housing due to eviction and would not be able to afford alternative housing, causing her to remain with Mr. J. As discussed above, exposure to Mr. J. would be detrimental to the child's well-being.

{¶19} In addition to Mother's lack of case plan compliance, other factors weighed heavily in favor of permanent custody. Significantly, the guardian ad litem opined that an award of permanent custody would be in the child's best interest. In support, she reasoned that (1) S.J. experienced sustained exposure to a traumatizing environment in the home she shared with Mother and Mr. J.; (2) Mother established a pattern of endangering her children, resulting in three convictions and the removal of three older children from her legal custody; (3) despite escalating incidents involving Mother's drinking and the children, Mother maintained that she does not have an issue with alcohol and gained no insight into the impact of her drinking on the safety of her children; and (4) S.J. expressed feeling safe with the foster parents but not with Mother.

{¶20} The child was six years old at the time of the permanent custody hearing. After returning to agency care in 2024, S.J. was diagnosed with posttraumatic stress disorder and has engaged in trauma therapy throughout the case. Her counselor testified that the child has yet to disclose specific incidents or events, instead withdrawing and refusing to discuss her time in Mother's care and matters involving Mother in general. The foster mother testified that S.J. frequently has nightmares about Mr. J., the man with whom Mother lived when the child was returned to her care and with whom Mother continues to reside, after visits with Mother. The caseworker testified that she is concerned about the environment where Mother was living based on incidents S.J. had reported involving Mr. J.

{¶21} There is limited evidence of the child's relationship with Mother during the 2022 case and the five months thereafter in Mother's care. The caseworker and guardian ad litem, both of whom were involved in the 2022 and 2024 cases, testified however that there was a marked change in S.J.'s personality after her return to agency care in 2024. While the child was sweet and friendly during the 2022 case, she became withdrawn and distrustful of others after returning to

agency care in 2024. S.J. was uncharacteristically quiet and anxious prior to visits with Mother. Although there were few concerns with Mother's interaction with child during visits, S.J. became quite emotional immediately thereafter. She exhibited aggressive behavior, experienced nightmares, and attempted to self-soothe by pulling out her hair. In an effort to alleviate the child's stress, CSB modified Mother's visits from in-person to video visitation. Unfortunately, ongoing contact with Mother exacerbated the child's anxiety and problematic behaviors, leading the guardian ad litem to move to suspend Mother's visitation. CSB supported the motion, and the juvenile court suspended Mother's visits with S.J. Mother had no contact with the child during the three months prior to the permanent custody hearing. S.J. remained calmer during that time.

{¶22} The child is bonded with her foster parents and reported feeling safe in their home. S.J. lived with the same foster parents for 30 months of her short life. Having only been out of the foster parents' home for five months between the two cases, S.J. readjusted quickly and regained the trust she had for them during her prior placement. The child remained leery of the caseworker and guardian ad litem, however, expressing fear that they would remove her from the foster home and again return her to Mother. For example, at one home visit by the caseworker and guardian ad litem, the child repeatedly whispered to the foster family's dog, "Go get them," so that they could not take her away from the foster parents.

{¶23} The child is well acclimated to school where she attends kindergarten. The foster parents socialize with other foster families on a regular basis. S.J. has developed a close relationship with the adults and children in those other foster homes. She trusts that "village of people" who make her feel safe.

{¶24} As to S.J.'s wishes, the guardian ad litem testified that the six-year-old child initially vacillated as to where she wanted to live, alternating between Mother and the foster

parents. More recently, however, the child would not answer the guardian either way regarding her desire for custody. Even so, S.J. told the guardian ad litem that she feels safe in her foster home. Moreover, the guardian ad litem testified that she overheard the child tell both the caseworker and the foster mother that she wants to stay in her foster home.

{¶25} The guardian ad litem expressed concerns about the option of extending temporary custody and prolonging the case because the child knows that as long as the caseworker and guardian ad litem continue to visit her, there is uncertainty which subjects her to ongoing stress. CSB investigated relative placement options for S.J., but none were viable.

{¶26} No factors in R.C. 2151.414(E)(7) to (11) are applicable to this case.

{¶27} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating parental rights and awarding permanent custody of S.J. to CSB. After spending more than a year and a half in CSB's custody, the child was returned to Mother. The agency again removed her just five months later based on the same concerns, albeit escalating circumstances, as in the first case. Mother has not addressed her alcohol use issues and, in fact, denies they exist, despite greater risk to the child and another conviction for child endangering. S.J.'s trauma manifests in problematic behaviors and requires intensive therapy to address. She has reported to the adults involved in the case that she does not feel safe with Mother. On the other hand, she feels safe and comfortable in the foster home and has told the caseworker and foster mother that she wishes to remain there. The child does not ask to see Mother. Her nightmares and self-harming behaviors have abated since Mother's visitation was suspended. S.J. has a strong bond with her foster family. After spending almost half her life in custodial limbo, permanent custody is the disposition available to provide S.J. with the safety, security, and stability she needs. In light of these circumstances, CSB

presented clear and convincing evidence that an award of permanent custody is in the best interest of the child.  Accordingly, the juvenile court's judgment terminating Mother's parental rights is not against the manifest weight of the evidence.  Mother's assignment of error is overruled.

III.

{¶28}  Mother's sole assignment of error is overruled.  The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

HENSAL, J.
STEVENSON, J.
CONCUR.


APPEARANCES:

THOMAS C. LOEPP, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.